*752 OPINION OF THE COURT
Carol Berkman, J.
The defendant, charged with criminal possession of a weapon in the third degree, moved to suppress that weapon on the grounds that its seizure violated his constitutional rights to be free of an unreasonable search and seizure. A hearing was held on September 17, 21 and 29, 1982, at which four witnesses testified: for the prosecution, Police Officer Richard Hayward, now retired, and Sergeant John Halbig; for the defense, defendant’s wife, Carol Griffin, and his brother-in-law, Clarence Swanston.
The People contend that the arrest of the defendant for driving while his license was suspended was “reasonable” based on a computer printout showing three suspensions or revocations of defendant’s license on three different dates. They argue that although the search could not be justified as incident to the arrest, an inventory search was lawful and reasonable because at the moment of the arrest the car’s owner (defendant’s wife) was not present to take custody of it. The defense contends that the defendant had a valid license on the date of his arrest, that his arrest was not supported by probable cause, and that the inventory search was in any event unreasonable and unlawful.
For the reasons stated below, the court agrees that the inventory search was unreasonable and grants the motion.
THE TESTIMONY
The police officers first saw the defendant’s car standing or parked four feet from the curb in a bus stop between two and three in the afternoon on September 1, 1979. As they approached to inquire of the female passenger where the driver was, the defendant appeared and said the car was his. He was told to move it.
According to Officer Hayward the defendant did not immediately comply but continued to talk to someone on the street. He then got in the car and drove 15 or 20 feet east, but stopped again, still in the bus stop, and spoke to another person. At this point, Hayward pulled the RMP into the intersection in front of the defendant’s car.
Halbig was puzzled by his partner’s actions. He did not notice any delay in compliance and did not mention that *753 defendant spoke to anyone when he stopped again. Indeed, Halbig said defendant’s car stopped at the crosswalk, but Halbig did not see the traffic signal. He simply assumed that defendant had the green light. His reasoning was that the RMP was in the intersection and was not bombarded by north-south traffic on the avenue. Hayward was not asked, and did not state, whether defendant’s car was at the intersection or what color the signal was.
The defendant was unable to produce a license and registration on the officers’ request. His only other identification was a business card and some past summonses. Defendant explained that he had lost his license. The officers took defendant to the station house to confirm his identity and issue summonses for driving without a license, parking in a bus stop and parking too far from the curb. The officers did not consider defendant to be under arrest at this time. The female passenger said she did not have a license, and Hayward drove her in defendant’s car to the station where he parked in the fenced precinct parking lot. The defendant had asked a man in the street to take the car but the officers would not allow this. At the precinct, the defendant asked his passenger to stay in the car and she complied.
According to Hayward, it could have been verified at the scene whether the car was stolen. Halbig disagreed. According to him, the out-of-State and out-of-city computer hookups could take up to several hours to come back with results.[1]
In the station house, defendant said he wanted to call his lawyer and was shown the pay phone. Meanwhile, Halbig *754 fed the defendant’s name and date of birth and the car’s license number into the FATN computer. Possibly before the computer results came back, but certainly before defendant’s car was inventoried, a person identifying himself as the defendant’s attorney telephoned the precinct’s commanding officer, who called Hayward in to get the details of the case. Hayward himself did not speak to the attorney.
The computer printout first came back at 2:35 p.m.[2] with Georgia license No. 9452110, “status valid,” issued to Eugene Griffin of a Georgia address, date of birth September 3, 1938. Subsequently, the computer printed out that the car was registered to Carol Griffin of the same Georgia address. At 2:51 p.m., the computer printed out a suspension on the Georgia license, dated August 25, 1980, reciting “Failed to Report Acc 9452110.” Another entry recites, on two lines, “Acc fat 09/11/79 9452110 Newly P [new line] Hear 03/10/81 accident — g stop.” The People offered no testimony to explain these entries, but the latter clearly indicates a hearing date subsequent to the suspension date. The hearing relates, as does the suspension to an . accident and the accident noted in the printout precedes both the suspension and the hearing. The disposition at the hearing is not shown. Finally, at 2:57 p.m., the computer printed out that a Eugene Griffin, of a New York address, date of birth September 3, 1937, and height one inch shorter than the Georgia Griffin, had a revocation in January, 1969, for an uninsured accident and a suspension in August, 1971, for failure to answer a summons. The printout also reads, “lic opee 06/30/69,” thereby casting doubt on the viability of the January revocation.
Halbig learned to use the computer simply by referring to a booklet which is left next to it. The police testimony did not explain the entries other than the suspensions or revocations. There is no testimony to show why Halbig concluded that the computer printout was not complete after the Georgia entries or why he concluded it was complete after the 2:57 p.m. entries.
Notwithstanding that the defense contended that defendant had a valid license, and offered a facially valid license *755 in evidence, and that the court repeatedly invited evidence supporting the accuracy of the printout, the People offered nothing further on the subject.
The officers testified that the policy of the New York City Police Department is to arrest rather than issue a summons when there are three different suspensions or revocations on three different dates. Accordingly, defendant was arrested, based on the computer printout, for driving while his license was suspended. The intention of the officers at this point was to issue a desk appearance ticket.
The first order of business, they testified, was to voucher and inventory the car. Before doing anything else to process the arrest, without discussing the issue with the defendant and without calling defendant’s lawyer or business number, Hayward went out, ordered the passenger to leave and began to inventory. It was Halbig who found the gun which is the subject of this indictment. Although Halbig was not himself responsible for the inventory, but was called out just to help Hayward open the trunk, he saw a leather pouch and picked it up “to see what was in it” and felt the gun through the soft leather.[3] A subsequent search of defendant’s person revealed marihuana.
At some point, Halbig could not remember when, defendant mentioned that the car was his wife’s. But, according to Hayward, he did not know and did not ask whether Carol Griffin was defendant’s wife and found out only when she came to pick up the car (or possibly only a little earlier when defendant supplied his pedigree). Hayward said that the only obligation was to notify the owner and they could not notify the owner directly because of her Georgia address. In any event, they would not have believed the owner was on her way unless she was actually present with proof of ownership.
*756 In their view, at the very moment of the arrest it became their instant obligation to make the passenger leave and to “safeguard” the property, although Hayward, at least, admitted that he was not concerned that the car would be stolen from the precinct lot.
In this regard, Carol Griffin testified that she received a call at her home in Riverdale from Hayward at about 2:30 or 2:35 p.m. telling her to come to the station to pick up her car and her husband. She remembered the time because she had just telephoned her beauty salon on 90th Street to tell them she would be a little late for a 2:30 appointment. She arrived at the precinct at or before 3:30 to be told that her husband was being detained and the car not yet ready.
The car was not finally released to her until hours later, its door panels loosened, glove compartment lock broken and compartment ransacked, carpet lifted up, seats out of position, property strewn throughout the trunk, and so forth. Her brother corroborated this description. The People’s rebuttal did not deny this; Halbig testified only that many other police officers became involved after the arrest, and that those officers could have been responsible for the damage.[4]
CONCLUSIONS OF LAW
The motion to suppress is granted for a number of reasons. First, the People did not come forward with sufficient credible evidence to show that defendant was committing a traffic infraction when the officers demanded his license and registration. Second, the police had at best only presumptive probable cause, and given the minor nature of the charge for which defendant was being arrested, as well as the obvious availability of reasonable alternatives to vouchering the vehicle, there was no real necessity for the police taking custody of the car. Accordingly, the inventory was both unnecessary and unreasonable.
A. THE INITIAL STOP AND SUBSEQUENT DETENTION
Since the court accepts the testimony that defendant’s vehicle was initially seen stopped in a bus stop *757 several feet from the curb, there can be no question that the officers had the right to approach the vehicle at that point and ask for defendant’s license and registration. Having chosen not to make that demand, the right to do so which arose from the illegal standing did not still exist when defendant’s car stopped at the intersection. The court concludes that the bare testimony that defendant’s car stopped again, without anything more than hindsight assumptions to say that that action was unlawful,[5] did not make a new basis for the officers’ blocking defendant’s car and demanding his license and registration.
To be sure, People v Ingle (36 NY2d 413, 414-415), requires only a minimal degree of suspicion to justify a stop and demand for license and registration. Had the officers testified candidly that they thought better of their initial waiver of issuing a summons for defendant’s minor traffic infractions, this stop might have been unexceptionable. But Hayward justified his actions on the basis of a new infraction and Halbig had not the foggiest notion why defendant was being stopped. This was not a case of a continuing Vehicle and Traffic Law infraction, unlike People v Pollaci (68 AD2d 71 [wrong license plate]). It is all too possible on this record that Hayward mistakenly and over-hastily concluded that his lawful order was being brazenly flouted.
Notably, Hayward returned to the stand for continued cross-examination after Halbig revealed that defendant’s car had stopped at the intersection and that he, Halbig, did not know why Hayward acted as he did. Nonetheless, the People made no application to reopen Hayward’s direct to clarify this important issue. Although the burden of proof is the defendant’s, the People have the burden of coming forward with credible evidence to justify the police actions. Defendant’s mere stopping of his car at an intersection is not such evidence. On this basis alone the evidence subse *758 quently seized from defendant’s car and his person should be suppressed.
Assuming, however, that the stop and demand for license and registration was reasonable, the officers did have the right to take defendant and his car to the precinct when he did not produce a license and registration and when he was also unable to provide adequate identification. Driving without a license is a traffic infraction. (Vehicle and Traffic Law, §§ 155, 509.) Failure of an operator to exhibit a license to a police officer is presumptive evidence that the operator is unlicensed. (Vehicle and Traffic Law, § 507, subd 2.) Similarly, failure of the operator to produce a registration is presumptive evidence that the vehicle is unregistered. (Vehicle and Traffic Law, § 401, subd 4.) Driving an unregistered vehicle is also a traffic infraction. (Vehicle and Traffic Law, §§155, 401, subd 1.) Since the defendant did not have identification, an immediate arrest for these infractions would have been justified. (People v Copeland, 39 NY2d 986.)
The officers chose not to make an arrest at this point, but to investigate further. The defendant and his car were detained and moved to the precinct for further investigation. And since defendant was presumptively an unlicensed driver and his car was presumptively unregistered, that police action was reasonable. While Halbig may have exaggerated the difficulties of checking the car’s provenance on the street, the officers were under no obligation to do so.
B. THE people’s FAILURE TO SHOW PROBABLE CAUSE
At the precinct, the FATN computer printout rebutted both the presumptions of nonlicensure and of non-registration. The arrest of the defendant was not motivated by his failure to produce license and registration. Nor was it motivated, as the People now argue, by the defendant’s failure to transfer his license and registration to New York when he moved to a New York address. If defendant was guilty of those infractions, that was discovered only at the hearing on the motion to suppress. The subsequent police actions cannot be retroactively justified on either of these bases. (See People v Harrison, 83 AD2d 965.)
*759 Instead, the officers’ decision to arrest defendant was predicated solely on the computer printout which, they say, indicates two outstanding suspensions and an outstanding revocation. Notwithstanding that the defense unambiguously challenged that printout, claiming that defendant’s license was valid, the People offered nothing beyond that printout. Thus, this case presents the issue of whether a printout can sustain a finding of probable cause after its accuracy has been challenged but not disproved by the defense.
In People v Jennings (54 NY2d 518), the Court of Appeals held that an arrest is invalid when premised on an inaccurate computerized criminal record file. In Jennings, a warrant had been issued but later vacated. The computer showed the issuance, but did not show the vacatur. The arrest pursuant to that printout was held to be unlawful. (See, also, People v Jones, 110 Misc 2d 875 [Fried, J.].) Jennings and Jones are both distinguishable from this case in that in both cited cases it was shown at the hearing that the computerized information was inaccurate. Here, defendant offered only his license, which did not prove that either that license or any former licenses had not been suspended or revoked. Nonetheless Jennings mandates the conclusion that a challenged computer printout is not enough to establish probable cause at a suppression hearing.
This court sees no reason to distinguish a computer printout from information received from a live fellow officer. Indeed, Jennings applied the fellow-officer rule of Whitely v Warden (401 US 560). But, if anything, a live fellow officer may be considered more reliable than computer records which, in the criminal justice system, are notoriously inaccurate and incomplete. (See, e.g., Is Big Brother Prone to Error, New York Times, Oct. 31, 1982, p E7, col 6 [nearly 50% of sample of FBI computer records incomplete or inaccurate].) Yet, with regard to a fellow officer, the People must come forward with additional evidence on a mere challenge by the defense:
“A police officer is entitled to act on the strength of a radio bulletin or a telephone or teletype alert from a fellow officer or department and to assume its reliability * * * *760 [H]e presumptively possesses the requisite probable cause to search * * *
“But where on a motion to suppress, a challenge to the receiver’s action is made, the presumption of probable cause that originally cloaked that action disappears from the case * * * [T]he People must demonstrate that the sender or sending agency itself possessed the requisite probable cause to act.” (.People v Lypka, 36 NY2d 210, 213.)
In other words, even apart from the contradictions and unexplained gaps on the face of the computer printout, in order to establish probable cause the People had the burden of coming forward to show that defendant’s New York and Georgia licenses were indeed suspended or revoked. This they declined to do.
Nonetheless, that printout gave the officers presumptive probable cause to arrest the defendant. Although the People did not establish probable cause at the hearing, an inventory search is not one depending on probable cause, but on the reasonable necessity for safeguarding the vehicle of the person who has been taken into custody, and for protecting the police from damage claims. Thus, it may be that irrespective of probable cause, if an arrest is made in good faith, evidence seized pursuant to a reasonable inventory search should not be suppressed.
The only authority this court is awáre of for this proposition is United States v Pappas (613 F2d 324). In that case, a car was seized pursuant to a forfeiture statute. The First Circuit held the warrantless seizure unlawful because it was remote in time from the events giving rise to probable cause and there were no exigent circumstances. The court then pointed to the fact that there had in fact been probable cause and that the warrant requirement was new. The court applied a good-faith exception to sustain the inventory search. (613 F2d, at pp 330-331.)
Professor LaFave criticizes this decision as both “astonishing” and “ridiculous” (LaFave, 2 Search and Seizure, 1982 Pocket Part, § 7.4, p 168, n 20), but the condemnation is not entirely merited.
In a situation such as the one in the case at bar, where there is presumptive probable cause to arrest, the police *761 may have no reasonable choice but to impound the vehicle. And if the vehicle must be impounded, an inventory is both necessary and reasonable even if the presumption of probable cause is later unsupported. The question then becomes whether the impoundment was reasonable and necessary. In this case, it was not.
C. THE UNREASONABLENESS OF VOUCHERING THE CAR
In order to support the reasonableness of vouchering and inventorying defendant’s wife’s car, the People rely in part on paragraph “e” of the section on “Invoicing Property — General Procedures” in the Police Academy Instructional Services Section, Field Supervisor’s Procedural Guide: “You may also direct a vehicle be taken into custody for safekeeping when the vehicle requires protection because of the inability of the owner or driver to remove it to a safe place (e.g. accident aided, prisoner) * * * Prior to taking a vehicle into custody for safekeeping, make every effort to have the driver, owner or a representative remove and safeguard the vehicle. A prisoner’s vehicle that can be driven will be removed to the precinct of record and invoiced for safeguarding * * * If the vehicle is not reclaimed within that time [24 hours], a member of the service will be assigned to drive the vehicle to the Property Clerk’s Vehicle Storage facility”. The People argue that this section distinguishes between the cars of prisoners and those of accident victims or other aided persons, and mandates that every arrested person’s vehicle be invoiced, without any effort to have some other authorized person care for the vehicle during the period of custody. But if the only purpose of invoicing is and must be benign (that is, safeguarding rather than searching), there can be no constitutional justification for the distinction the People seek to draw. Whether the driver has been arrested for a crime or has had a heart attack, the sole police motivation must be to safeguard property and prevent lawsuits.[6]
*762 Moreover, this court has been informed by Lieutenant Tousma, commanding officer of the Office of Management Analysis, Management Procedure Section, of the New York City Police Department (NYCPD), that he has not seen the Field Supervisor’s Procedural Guide, and believes that it is used for instructional purposes. According to Lieutenant Tousma, all police officers are directed to follow the Patrol Guide and the only other official rules concerning an inventory search would be those on the back of police forms such as property invoices.
Procedure No. 113-4 of the Patrol Guide, simply provides for invoicing “[w]hen necessary to store a vehicle in police custody at station house.” The reverse of the invoice form provides, in paragraph 2, “Safekeeping vehicle/boat requires portection [sic] because of the inability of the owner/driver to remove to a safe place (e.g., prisoner, aided, accident, etc.). Every effort will be made to have owner, driver or authorized representative remove and safeguard. Prisoner’s vehicle will be held at stationhouse for 24 hours pending return or delivery to pound.”
It would thus appear that, contrary to the testimony of both officers, the police department expects that reasonable efforts, indeed “every effort”, will be made to locate an alternative custodian before a vehicle is vouchered. Calling Georgia might not be required, but the studied lack of curiosity exhibited by these officers as to the identity and whereabouts of the registered owner, who had the same address and surname as defendant, is simply unacceptable as a matter of law and incredible as a matter of fact. The court simply cannot credit Hayward’s testimony that he did not telephone Mrs. Griffin until 4:30.
Unfortunately, the defense testimony on the issue of when Mrs. Griffin was called was also not entirely credible. Mrs. Griffin testified that she received a call from Hayward at about 2:30 and arrived at the station by 3:30. She had an obvious motivation to falsify, and, in addition, it is at least strange that she should still be home at 2:30 and consider herself only a little late for her appointment 100 blocks away. Finally, since the computer printout was not apparently complete until almost 3:00 p.m;, it appears *763 unlikely that the police would have telephoned her before that time.
Whatever time the officers reached Mrs. Griffin, however, and contrary to the officers’ testimony, there is nothing in the NYCPD regulations which requires that invoicing be absolutely contemporaneous with the arrest. In fact, some cases have pointed to such haste as indicating that the inventory is a pretext and a sham. (See People v Granese, 32 AD2d 568, as explicated in People v Robinson, 36 AD2d 375; People v Allocco, 59 AD2d 895, 896; see, also, Dyke v Taylor Implement Mfg. Co., 391 US 216; State v McDaniel, 156 NJ Super 347.)
The haste was particularly unnecessary here where the defendant’s car had already been at the station house for at least half an hour in the care of a person designated by the defendant while the defendant was in police custody although not formally under arrest. There was no indication to the police that she refused the responsibility, or was in a hurry to leave, or that she or defendant was unable to find a licensed driver to remove the vehicle. Notably, the officers had no doubt that defendant had been legitimately in possession of the vehicle. In short, there was no necessity for the immediate invoicing, either from the point of view of safeguarding defendant’s property or that of protecting the police from false claims.
In this jurisdiction, the courts have never explicitly discussed the extent to which police must explore the alternatives to impoundment before an impoundment and inventory search. Either the impoundment has been found, virtually without explanation, to be a sham, as in Gránese or Allocco, or the inventory is allowed without discussion of whether any alternatives were explored. (E.g., People v Molloy, 56 AD2d 877; People v Middleton, 50 AD2d 1040, affd 43 NY2d 703; People v Kern, 67 Misc 2d 495; People v Smith, 62 Misc 2d 473; see, also, United States v Ochs, 461 F Supp 1, 5.) Cases such as People v Sullivan (29 NY2d 69) and South Dakota v Opperman (428 US 364), are not directly relevant because they are towing cases in which no owner or driver was present and therefore there was no alternative to the impoundment.
*764 Many other jurisdictions have explicitly considered the issue, however, and most, if not all, of them require some level of effort to find an alternative to impoundment, especially where the arrest is for a minor offense. The required efforts range from informing the defendant of the alternatives — such as having someone pick up the car, parking on the street (for which defendant must execute a release) or impoundment — to at least waiting a reasonable time for a legitimate custodian to pick up the vehicle. (E.g., People v Miller, 7 Cal 3d 219; State v Thomason, 153 Ga App 345; State v Boster, 217 Kan 618; Wagner v Commonwealth, 581 SW2d 352 [Ky]; State v Slockbower, 79 NJ 1; State v Phifer, 297 NC 216; State v Goodrich, 256 NW2d 506 [Minn]; State v Sawyer, 174 Mont 512; Drinkard v State, 584 SW2d 650 [Tenn]; State v Bales, 15 Wash App 834; State v Goff, 272 SE2d 457 [W Va]; State v McDougal, 228 NW2d 671 [Wis].)
The cases also focus on the amount of time the prisoner is expected to be in custody. (E.g., State v Bales, supra.) In Bales, the defendant was arrested on a traffic warrant and accordingly it was expected that his absence from his vehicle to post bail on that matter would be only temporary. The impoundment was found to be unreasonable. Here, the police were preparing to give the defendant a desk appearance ticket. His absence, too, was only expected to be temporary. If he could not have driven the car away, with his then presumably suspended license, he could have made other arrangements.
Finally, the inventory in this case did not achieve the purposes for which an inventory is permitted. Defendant’s car and its contents were damaged and apparently this was done by police officers unlawfully searching the vehicle. While it may be that an inventory does not become pretextual merely because it is not completed when contraband is found (Girardi v Commonwealth, 221 Va 459), the indifference to the property supposedly protected, or carelessness with it, is another matter, and clearly indicates that the so- . called inventory was a sham. (See State v McDougal, 228 NW2d 671, 678-679, supra.)
It is not now clear what the limits of an inventory search are. (Cf. People v Roman, 53 NY2d 39 [relying on Arkansas *765 v Sanders, 442 US 753], with New York v Belton, 453 US 454, and United States v Ross, 456 US 798 [overruling Arkansas v Sanders].)
It is clear, however, that even if Roman still defines the limits of an inventory search, such a search is an extreme intrusion. The intrusiveness is dramatized in this case by the fact that Halbig’s motives when he picked up the soft pouch containing the gun was not to list that item on the inventory, but to satisfy a casual desire “to see what was in it.” As an extreme intrusion, an inventory can only be justified by necessity, and not by mere convenience. Our police department regulations certainly appear to require a reasonable quest for an alternate custodian before the police impound a vehicle. Such a quest would have been successful in this case.
The court’s conclusion that the impoundment was unreasonable is strengthened by the minor nature of the arrest, by the absence of probable cause and the police reliance for probable cause upon a confusing and contradictory computer printout, by the fact that defendant was not expected to be in custody for long, and, finally, by the fact that the impoundment did not protect defendant’s property.
Accordingly, the motion to suppress is granted.

. He also said, when encouraged by a series of leading questions from the prosecutor, that waiting on the street for a computer check could lead to a volatile street situation. Aside from the fact that this answer had to be extracted from him, Halbig could remember little about the specific street situation when defendant was detained. Thus, as a reason why the car had to be taken to the station, this has the distinct flavor of hindsight. Moreover, it would appear that Halbig is incorrect, and that under normal circumstances the car’s legal status — at least whether there was a stolen car alarm out for it — could have been readily determined by radio. (See, e.g., United States v Ochs, 461 F Supp 1, 4.) According to the computer printout, the information that the car was registered to Carol Griffin of the same Georgia address as defendant’s returned in approximately 15 minutes.

. Halbig testified that he would not trust the time printout on the computer, that he had known it to be off by as much as 20 minutes.

. From the point of view of the People’s ability to prove defendant’s guilt, it is interesting to note that Halbig could not say whether the trunk was locked. The difficulty in opening it was due to a latch which Hayward did not find. Additionally, unless the People can bring in the passenger or some other witness who could testify that the car was not tampered with after defendant left it, the People would not be entitled to invoke the statutory presumption. (Cf. People v Bennett, 47 AD2d 322, with People v Anthony, 21 AD2d 666.)

. The People’s offer of proof was that defendant was “debriefed” by narcotics officers. However, on the defense objection, no testimony was permitted on the reasons, if any, that this was thought to be appropriate.

. This is especially so since Hayward’s testimony showed him to be somewhat hasty in making assumptions and then stubborn about sticking to those assumptions as though they were actually remembered facts. For example, on a number of occasions he insisted that Mrs. Griffin had displayed her registration when she picked up the car, possibly because police regulations call for such proof of ownership. Only after repeated questioning did he admit that he simply did not remember.

. There has been no suggestion that this case presents the special situation present in Cady v Dombrowski (413 US 433), where there was good reason to believe that the police officer-driver had a gun in his car, and the inventory was undertaken to prevent the possible theft of that weapon. Thus, in this instance, protecting the safety of the public was not one of the possible reasons for the inventory.