THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
THOMAS G. LAWSON, Defendant-Appellee.

Fifth District   No. 82—562

Opinion filed October 18, 1983.

Barbara Adams, State's Attorney, of Hillsboro (Stephen E. Norris and Mark A. LaRose, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Denis McGrady, Jr., of McGrady & McGrady, of Gillespie, for appellee.

JUSTICE JONES delivered the opinion of the court:

This appeal by the State presents the question of whether the police officer who arrested the defendant, Thomas Lawson, had the authority to do so when the arresting officer had come to the defendant's home to arrest him in reliance upon a "warrant list" showing an arrest warrant to be outstanding against him that had, in fact, been served upon him four to six weeks earlier.

On December 23, 1981, at about 9 a.m. William Dolahite, Chief of Police in Litchfield, which is located in Montgomery County, arrived at the defendant's home to arrest him pursuant to the warrant list. Once inside the defendant's home he observed cannabis and found, as the result of a search of a coat prompted by the discovery of the cannabis in plain view, a packet of a substance that proved upon subsequent analysis to be cocaine. Defendant was charged that day with the misdemeanor of unlawful possession of cannabis, specifically, not more than 2½ grams of a substance containing cannabis, in violation of section 4(a) of the Cannabis Control Act (Ill. Rev. Stat. 1981, ch. 56½, par. 704(a)). He was charged later with the felony of unlawful possession of a controlled substance containing cocaine, specifically, less than 30 grams of a substance containing cocaine, in violation of section 402(b) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1981, ch. 56½, par. 1402(b)). Following a hearing the trial court, in a docket entry expressing no findings of fact, granted the defendant's motion to suppress the evidence seized at his residence on the day in question.

At the hearing on the motion to suppress Chief Dolahite testified that a warrant list is received "every month from [the] Montgomery County Sheriff's Office" and that he was using "our latest warrant list. I assume it was the December list." The warrant list, he said, indicated that a warrant for the defendant's arrest was outstanding. He had not had the warrant in his possession but had relied upon the list. He had seen the defendant's name "on the warrant list for quite a while and had never seen anyone there around the [defendant's]

house," he said, but "this morning [December 23, 1981] I happened to see someone there."

At the door of defendant's residence Chief Dolahite told the defendant that he "had a warrant for him out of Morgan County." The witness testified that the defendant had asked if he could change his clothes and that he had answered that if defendant did so, the witness would have "to stay with him." According to the witness, the defendant invited him to come in and sit down. Once inside the residence, in the living room Chief Dolahite observed and seized the contraband in question. The witness testified that at the time of the search and seizure he believed that the warrant was still in effect ant that after he and the defendant had arrived at the police station the defendant informed him that the warrant had already been served. Through a telephone call he placed to officials in Morgan County, Chief Dolahite learned that the warrant had, in fact, already been served. He testified that there were no records in Montgomery County that would have shown the warrant to have been served and that by telephone he notified the sheriff's office, apparently in Montgomery County, that the warrant had already been served. "[T]he Sheriff's Office," he said, "did not know that it had been served or cancelled. And I advised them to cancel it."

On cross-examination by the State he testified that the warrant list consists of several pages and contains hundreds of names of persons from Montgomery County and other counties upon whom arrest warrants are to be served. The list is, he testified, updated monthly by the sheriff's department. The list includes both the charge and the amount of bond as well as the date of the warrant. The witness indicated that the usual practice in his department is not to require having the warrant itself in hand as long as the arresting officer considers the warrant valid. He said that if a name is on the warrant list, the police department does not have the warrant itself, explaining, "We have always picked them up on the warrant list and the Sheriff's Department serves the warrant on them." Neither the warrant list upon which Chief Dolahite relied nor any prior warrant lists were offered into evidence.

Both the defendant and his girlfriend, Glenda Roche, testified that defendant had told Chief Dolahite at the defendant's residence that the warrant had already been served, according to Ms. Roche, "about a month" earlier and, according to the defendant, "probably a month, month and a half" earlier. The defendant testified that after Chief Dolahite had told him at the door of the residence that he had a warrant for the defendant's arrest, defendant had said, "[I]f you check that I

believe you'd see it has already been taken care of." He testified further that Chief Dolahite had said of the warrant that "it was a whole different deal than what I had already taken care of. He wasn't sure. He knew it was different than [sic] the other one was [sic] because he knew it had already been taken care of." The warrant had been issued, he said, for "a hospital bill that I had hard feelings about having to pay. But I didn't go to court over it and they put a contempt of court order or something like that and I had to go take care of the warrant." He stated that when the warrant had been served on him, he had "posted bond, [gone] to Morgan County, paid the bill and everything was taken care of." The defendant denied having invited Chief Dolahite into the house, testifying instead to having told him to "wait right here" on the back porch of the house. Chief Dolahite, he said, "came in anyway." We note that on numerous points concerning the search the testimony of Chief Dolahite differs from that of the defendant and Ms. Roche. We need not set forth that testimony in view of the disposition we make in the case.

■ On appeal the State contends that the arresting officer had the authority to arrest defendant because of his reasonable belief that the warrant was still outstanding. Citing *Whiteley v. Warden* (1971), 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031, and *People v. Decuir* (1980), 84 Ill. App. 3d 531, 405 N.E.2d 891, the State concedes that "the law is well settled that a warrant issued without probable cause is *per se* invalid and cannot be used by an officer as the sole basis for arrest." However, the State distinguishes the situation in which a warrant has been issued on the basis of insufficient information to support an independent judicial assessment of probable cause from the situation in the case at bar in which the warrant enjoyed unassailable legal existence, at least until sometime in November of 1981 when the defendant posted bond for it.

The State relies heavily upon *Childress v. United States* (D.C. App. 1977), 381 A.2d 614, in which the arresting officers had observed the defendants acting suspiciously and had learned through a "tag check," based on the license number of the car in which the defendants were riding, that there were four traffic warrants outstanding for Childress, the owner of the car. The officers stopped the car, ordered the defendants out, and observed certain items in plain view in the car. Police informed Childress that he had been stopped because of the outstanding traffic warrants and arrested him on them. Childress and the other defendants were subsequently found guilty of charges related to the personal property the officers had observed in the vehicle. However, Childress had posted collateral for the

outstanding traffic warrants four days before the stop of the vehicle. On appeal the court held, "under the circumstances here presented, the police officers' good faith reliance on the radio report and the resultant reasonable belief that valid traffic warrants were outstanding provided probable cause to arrest appellant Childress." (381 A.2d 614, 616.) The court reasoned that

"[a]dministrative delays attendant to the operation of any metropolitan area police department resulted in failure to remove the satisfied warrants from the computerized 'active' list before the officers received the radio dispatch on [the day of the arrest] that the warrants were outstanding. This combination of reasonable administrative delay and reasonable police reliance on misinformation produced by such a delay presents a situation in which acceptance of appellants' position would do nothing to advance the purposes of the exclusionary rule. *See Weeks v. United States,* 232 U.S. 383, 391-93, 34 S. Ct. 341, 58 L. Ed. 652 (1914). There is simply no unlawful or improper police conduct here to deter." (381 A.2d 614, 617-18.)

In the omitted footnote the court stated that two days of the four-day delay were "attributable to [a] weekend" and distinguished *Childress,* on the basis of "[j]ustifiable administrative delay," from the case of *United States v. Mackey* (D. Nev. 1975), 387 F. Supp. 1121, upon which the defendant in the instant case relies.

In *Mackey* the defendant had been attempting to "thumb a ride" in Nevada when officers asked him to identify himself. With the aid of information on his driver's license the officers checked the defendant by computer through the National Crime Information Center and learned that he was wanted in Monterey, California, for violation of probation. The officers arrested him and took him to the police station. While an attempt was being made to verify the defendant's contention that the warrant was no longer outstanding, the defendant was booked, during which process a shotgun was found in a duffel bag in his possession. Federal charges were brought for possession of the weapon. The warrant in question had, in fact, been complied with approximately five months prior to the defendant's arrest in Nevada. On appeal, finding it unnecessary to consider the fourth amendment arguments advanced by counsel, the court concluded that the arrest of the defendant under the circumstances constituted a denial of due process of law and granted the defendant's motion to suppress the evidence. The court found that

"a computer inaccuracy of this nature and duration, even if unintended, amounted to a capricious disregard for the rights of

the defendant as a citizen of the United States. The evidence compels a finding that the government's action was equivalent to an arbitrary arrest, and that an arrest on this basis deprived defendant of his liberty without due process of law. Once the warrant was satisfied, five months before defendant's arrest, there no longer existed any basis for his detention, and the government may not now profit by its own lack of responsibility." (387 F. Supp. 1121, 1125.)

In reaching its decision the court assessed some of the consequences, both actual and possible, of the error to the defendant:

"Because of the inaccurate listing in the NCIC computer, defendant was a 'marked man' for the five months prior to his arrest, and, had this particular identification check not occurred, he would have continued in this status into the indefinite future. At any time, as demonstrated by this situation, a routine check by the police could well result in defendant's arrest, booking, search and detention. Further, there is no evidence to suggest that defendant would not continue to be subject to such humiliation until Monterey police officials cleared the computer of the warrant." 387 F. Supp. 1121, 1124.

We find the analysis in the case of *People v. Jones* (1981), 110 Misc. 2d 875, 443 N.Y.S.2d 298, likewise instructive. In *Jones* officers discovered, by the use of the number of the license plate on an automobile in which the defendants were passengers, an "alarm" indicating that the automobile had been stolen. Despite the driver's protestations that the automobile was not stolen, the driver and the defendants were arrested and ordered out of the vehicle. Controlled substances were seized from one of the defendants. The three were taken to the precinct for processing, at which time controlled substances were seized from the other defendant. The vehicle had, in fact, been stolen about three months prior to the arrest of the defendants but had been recovered and returned to its owner about three days after the theft had occurred. There was a failure, however, to correct the information in the data bank of the computer to show that the automobile had been recovered. In considering whether the arrests were valid, the court concluded:

"Absent satisfactory explanation, and here there was none at all, a three-month failure to correct or update the police computer records is unreasonable and unacceptable. While some delay is to be expected, the People have the burden of establishing that the three-month delay in permitting the records to remain uncorrected was not the fault of the police, whether negligent

or intentional. Otherwise a person, having once reported his car to be stolen and later having it recovered by the police, would be potentially subject to arrest and consequent search whenever driving in his automobile, for the indefinite future. Moreover, as demonstrated by this case, a similar fate would be lurking with regard to anyone to whom he lends the car. This situation is intolerable." 110 Misc. 2d 875, 884, 443 N.Y.S.2d 298, 304.

In 1 Search and Seizure sec. 3.5(d), at 636 (1978), Professor La-Fave observes of such cases,

"The point is *not* that probable cause is lacking because it turned out that the 'facts' upon which the officer acted were actually not true, for quite clearly information sufficient to establish probable cause is not defeated by an after-the-fact showing that this information was false, any more than information insufficient to show probable cause can be found adequate on the basis of an after-the-fact showing that in fact the conclusory allegations were correct. Rather, the point is that the police may not rely upon incorrect or incomplete information when they are at fault in permitting the records to remain uncorrected."

■■ The State acknowledges that "the *Childress* line of reasoning must have some temporal limits" but maintains that "the delay of but a few weeks in the instant case, between the satisfaction of the warrant and the arrest, is not so extreme to [*sic*] necessitate the harsh result justified in *Mackey*." However, the amount of time that has passed from the satisfaction of the warrant until the arrest is, we think, not the only factor to be considered in passing upon the question of reliance by police upon incorrect information. The parties have not addressed, for example, the important consideration—and distinction between the instant case and the cases upon which they rely—that the nature of the error here could well lead and, in fact, did lead to a search and seizure that took place in the defendant's dwelling, as opposed to a search of his automobile or of his personal belongings incident to arrest.

■■ We think the situation in the case at bar is more nearly analogous to the one in *Mackey* and *Jones* than to the one in *Childress*. Here the defendant's name was erroneously included in the warrant list being used in the month of December. It would presumably have appeared, had he not been arrested in the month of December, on each subsequent warrant list indefinitely into the future. The presence of the defendant's name on the list used late in December,

although the warrant had been served in November, shows that the error was decidedly not the kind of error apparently contemplated in *Childress*, that is, an error that will be corrected in a short period of time through the operation of routine administrative procedure. The unexplained error in the instant case appears to be one that could have been corrected only, in all likelihood, by the arrest of the defendant, as actually happened. During the period of time in question—and potentially for a much longer period of time—the defendant was subject at any time and in any place, including his home, to the humiliation of arrest, booking, search, and detention through no fault of his own but because of a mistake on the part of the police. Such a situation is not to be tolerated or encouraged by allowing the police to rely on an error of their own making whose detection virtually necessitates the arrest and detention of a citizen, very likely in his own home. Therefore, we hold that under the circumstances the arresting officer lacked the authority to arrest defendant on the warrant for his arrest that was incorrectly included as an outstanding warrant on the warrant list upon which the officer relied.

■■ ■ Because Chief Dolahite entered the defendant's dwelling without lawful authority to arrest him in the absence of either exigent circumstances or the voluntary consent of the defendant, his entry was unlawful. (See *People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608.) Even assuming that the defendant did invite Chief Dolahite into the house, although the defendant testified to the contrary, the invitation could not constitute voluntary consent by the defendant to his entry in light of the circumstances under which it was given: Chief Dolahite testified that if the defendant were to change his clothes, the police officer would have "to stay with him," whereupon the invitation to enter followed. Because the entry into the dwelling was unlawful, the seizure of items from it was illegal. Since the officer lacked the authority to arrest the defendant, the search of the defendant's coat, if the search of it were considered to have been undertaken as incident to his arrest, was likewise unlawful and the seizure from it illegal. The seizure from the coat was, likewise, illegal. Hence, all of the material seized by Chief Dolahite pursuant to his wrongful entry is inadmissible into evidence. Accordingly, we affirm the trial court's granting of the defendant's motion to suppress that evidence.

Affirmed.

KARNS and KASSERMAN, JJ., concur.