

William B. Terry, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff, U. S. A.

Kenneth C. Cory, Federal Public Defender, Las Vegas, Nev., for defendant, James Owen Mackey.

### MEMORANDUM AND ORDER

CLARY, Senior District Judge, Sitting by Designation.

A federal grand jury in the District of Nevada returned a two-count indictment against the defendant, James Owen Mackey, charging him with possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(c), (d) and 5871. On January 10, 1975 a hearing was held on defendant's motion to suppress evidence seized from him. There is no substantial disagreement as to the events which occurred, and only one question is presented for resolution.

On the evening of October 24, 1974, defendant was attempting to "thumb a ride" along Interstate 15 in an area patrolled by the North Las Vegas Police Department. He was approached by Officers Lathan and Judd who requested that he identify himself. In response, defendant produced a California driver's license. The officers checked the defendant through the National Crime Information Center (NCIC) and learned through their dispatcher that he was wanted in Monterey, California for probation violation. Relying on this information, the officers arrested the defendant and took him to the police station.

Although it was not the usual practice, Officer Judd made a telephone call to the Monterey Police Department to verify defendant's contention that the warrant was no longer outstanding. The Monterey Police Department indi-

**UNITED STATES of America**
**v.**
**James Owen MACKEY.**
**Crim. No. LV 74–187.**

United States District Court,
D. Nevada.

Jan. 21, 1975.

cated that it could not verify the warrant at that time because the issuing agency was unknown.[1] Officer Judd then testified that his supervisor directed him to make no further calls, but to follow the usual procedure of sending teletype messages requesting verification of the warrant. The usual procedure also called for the individual in custody to be booked prior to sending the teletypes because of the time factor involved in receiving a reply.

Summarizing the facts in this case as noted above, it clearly appears;

1. On the 24th day of October 1974, defendant as well as other pedestrians were seeking a ride (hitchhiking) along I-15 in the North Las Vegas area and among those interviewed by the North Las Vegas Police was defendant, James Owen Mackey.

2. That he showed them his identification (California driver's license).

3. That his name and description was put on the NCIC computer and the return answer showed an outstanding fugitive warrant for violation of probation out of Monterey, California.

4. That without this false and erroneous information, the officer testified he would not have detained him and would have sent him on his way.

5. That the false and erroneous information furnished by NCIC was the sole cause of his arrest.

6. That the information received was false in that the warrant had been complied with some five months previous to the incident of arrest in this case.

During the booking process, a .12 gauge Taiya Juki Japanese shotgun was found in a duffle bag in defendant's pos-

session. Possession of this weapon is the basis of the federal charges and the evidence which defendant seeks to suppress.

At the hearing, the attorneys for both the defendant and the United States stipulated that the shotgun would be admissible into evidence if defendant's motion were denied. The effect of this stipulation will be noted shortly. Further, it was stipulated that the warrant for the defendant's arrest for probation violation was satisfied as of May 1974, approximately five months before the events in question.

Defendant's sole contention for excluding the shotgun from evidence is that the NCIC information was inaccurate, and had been inaccurate for five months, when the arrest was made. The arrest, he argues, was therefore illegal. No challenge has been raised as to the conduct of the officers after the arrest itself. The parties have so stipulated and no evidence to support a contrary position was introduced. Therefore, events subsequent to the arrest may be disregarded in reaching a decision. Assuming, without deciding, for the purpose of this motion that an accurate NCIC report or "hit" is sufficient to establish probable cause for arrest, must evidence otherwise admissible be suppressed because it was seized subsequent to an arrest based solely on NCIC information[2] which was inaccurate when relayed to the arresting officers and which had been so for five months?

After careful consideration of the testimony, arguments of counsel and written briefs, this Court is of the opinion that the arrest of the defendant under

1. The issuing agency could have been the Monterey Police Department, The Monterey Park Police or the Monterey Sheriff's Office. The Monterey Police Department reported only that they had no outstanding warrant for the defendant.

2. The Government's contention that the defendant could have been arrested for hitch-

hiking, a violation of N.R.S. 484.331, is irrelevant since that was not the offense for which he was arrested. Defendant's exhibit C, the booking sheet, indicates that defendant was initially charged with "Prob. Violation (NCIC)." Additional charges were brought only after the discovery of the shotgun.

the circumstances described constituted a denial of due process of law. The motion to suppress must be granted.

The NCIC is an outgrowth of the Attorney General's congressionally mandated obligation to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records" and to exchange such information with "authorized officials" on both the federal and state level.[3] Under the auspices of the Federal Bureau of Investigation, NCIC is to provide computerized information to law enforcement agencies in eight categories including outstanding warrants, stolen vehicles and certain identifiable stolen property.[4] The information gathered and stored in the computer is not the "property" of the FBI, but of the agencies which submit it originally. See Menard v. Saxbe, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974); Menard v. Mitchell, 328 F. Supp. 718 (D.D.C.1971). This disclaimer of federal "ownership," as well as the need for accuracy, has also been made in a policy statement approved by the NCIC Advisory Policy Board.

In a national system, although individual users are responsible for the accuracy, validity, and completeness of their record entries and their action decisions on positive responses to inquiries, more stringent controls with respect to system discipline are required.[5]

Further, under the heading of Steps to Assure Accuracy of Stored Information, the policy statement provides:

A. The FBI/NCIC and state control terminal agencies will make continuous checks on records being entered in the system to assure system standards and criteria are being met.

B. Control terminal agencies shall adopt a careful and permanent program of data verification including:

1. Systematic audits conducted to insure that files have been regularly and accurately updated.

2. Where errors or points of incompleteness are detected the control terminal shall take immediate action to correct or complete the NCIC record as well as its own state record.[6]

This aspect of the FBI's operation, "storage" of criminal records and information, has been the subject of recent, and potentially far reaching, litigation. In this still nebulous area of the law, some solid areas have nevertheless emerged. The "passive recipient" theory advanced by the government for FBI record keeping has been rejected. Tarlton v. Saxbe, 507 F.2d 1116 (D.C.Cir. 1974); Menard v. Saxbe, 162 U.S.App. D.C. 284, 498 F.2d 1017 (1974). Further, while not a guarantor of the absolute accuracy of all its records, the FBI has some duty to insure that the information which it disseminates is

3. (a) The Attorney General shall—(1) acquire, collect, classify, and preserve identification, criminal identification, crime, and other records; and (2) exchange these records with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions. (b) The exchange of records authorized by subsection (a)(2) of this section is subject to cancellation if dissemination is made outside the receiving departments or related agencies. (c) The Attorney General may appoint officials to perform the functions authorized by this section. 28 U.S.C.A. § 534 (1968).

4. NCIC—A Tribute to Cooperative Spirit, reprinted from FBI Law Enforcement Bulle-

tin, Feb. 1972, p. 2; DeWeese, Reforming Our "Record Prisons": A Proposal for the Federal Regulation of Crime Data Banks, 6 Rutgers-Camden L.J. 26, 30 (1974).

5. National Crime Information Center (NCIC) Computerized Criminal History Program Background, Concept and Policy, approved by NCIC Advisory Policy Board, June 11, 1974, p. 3.

6. Id. at 12. Further, NCIC sends printouts to each contributing agency to verify the accuracy of data on file. In the case of wanted persons, these printouts are sent every 90 days. NCIC—A Tribute to Cooperative Spirit, reprinted from FBI Law Enforcement Bulletin, Feb. 1972, p. 4.

accurate,[7] Tarlton v. Saxbe, *supra,* and it must remove from its criminal files "arrest records" which the contributing agency has advised it were not reflective of legal arrests. Menard v. Saxbe, *supra.*

In Menard v. Mitchell, 139 U.S.App. D.C. 113, 430 F.2d 486 (1970) (*Menard I*), Chief Judge Bazelon noted the consequences of having an "arrest record" with the FBI even if no conviction results:

> Information denominated a record of arrests, if it becomes known, may subject an individual to serious difficulties. Even if no direct economic loss is involved, the injury to an individual's reputation may be substantial. Economic losses themselves may be both direct and serious. Opportunities for schooling, employment, or professional licenses may be restricted or nonexistent as a consequence of the mere fact of an arrest, even if followed by acquittal or complete exoneration of the charges involved. An arrest record may be used by the police in determinating whether subsequently to arrest the individual concerned, or whether to exercise their discretion to bring formal charges against an individual already arrested. Arrest records have been used in deciding whether to allow a defendant to present his story without impeachment by prior convictions, and as a basis for denying release prior to trial or an appeal; or they may be considered by a judge in determining the sentence to be given a convicted offender. *Id.* at 490–491 (footnotes omitted).

While analogous to a degree to the cases previously noted, the instant case has significant distinguishing features. First, this is a criminal case with crimi-

nal penalties awaiting the defendant if he is convicted.[8] Second, NCIC is a different type of storage system than the general Identification Division. NCIC appears designed for rapid reference to specific current information while the Identification Division, containing fingerprint and arrest records, is to store information more static in nature. Third, the defendant seeks to suppress evidence obtained as a result of information in the system rather than to expunge the information itself. Finally, the consequences of the dissemination of inaccurate information in this case are more serious than those listed by Chief Judge Bazelon in *Menard I.*

Because of the inaccurate listing in the NCIC computer, defendant was a "marked man" for the five months prior to his arrest, and, had this particular indentification check not occurred, he would have continued in this status into the indefinite future. At any time, as demonstrated by this situation, a routine check by the police could well result in defendant's arrest, booking, search and detention. Further, there is no evidence to suggest that defendant would not continue to be subject to such humiliation until Monterey police officials cleared the computer of the warrant. *See* Menard v. Saxbe, *supra.* Moreover, this could happen anywhere in the United States where law enforcement officers had access to NCIC information. Defendant was subject to being deprived of his liberty at any time and without any legal basis.

In the words of the District of Columbia court, " . . . there is limit beyond which the government may not tread in devising classifications that lump the innocent with the guilty." Menard v. Mitchell, 139 U.S.App.D.C. 113, 430 F.2d 486, 492 (1970). In this instance that limit has surely been pass-

---

7. The *Tarlton* court stated that on remand the district court was to determine what steps were necessary to insure reasonable accuracy after considering the needs of both the government and private individuals.

8. If convicted, the defendant faces a possible penalty of a $10,000 fine and 10 years in prison, or both, for each violation of the statute with which he is charged. 26 U.S. C.A. § 5871 (1974).

ed. What was said of the FBI's Identification Division appears true also in the case of NCIC:

There are no controls on the accuracy of information submitted by the contributing agencies. The Bureau exercises little supervision and control over contributing agency uses of the records the FBI disseminates. We are not now called upon to evaluate these practices of the FBI. However, this case does call upon us to take into account that the FBI's function of maintaining and disseminating criminal identification records and files carries with it as a corollary the responsibility to discharge this function reliably and responsibly and without unnecessary harm to individuals whose rights have been invaded. The FBI cannot take the position that it is a mere passive recipient of records received from others, when it in fact energizes those records by maintaining a system of criminal files and disseminating the criminal records widely, acting in effect as a step-up transformer that puts into the system a capacity for both good and harm. Menard v. Saxbe, 162 U.S.App.D.C. 284, 498 F.2d 1017, 1026 (1974) (footnotes omitted).

The Court finds that a computer inaccuracy of this nature and duration, even if unintended, amounted to a capricious disregard for the rights of the defendant as a citizen of the United States. The evidence compels a finding that the government's action was equivalent to an arbitrary arrest, and that an arrest on this basis deprived defendant of his liberty without due process of law.[9] Once the warrant was satisfied, five months before defendant's arrest, there no longer existed any basis for his detention, and the Government may not now profit by its own lack of responsibility.

This raises the question of the relief to which the defendant may be entitled; a question already answered by the Supreme Court:

Our decisions recognize no exception to the rule that illegally seized evidence is inadmissible at trial, however relevant and trustworthy the seized evidence may be as an item of proof. Davis v. Mississippi, 394 U.S. 721, 724, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676 (1969).

The fact that state officials, on information supplied by NCIC, made the actual arrest and search in no way insulates the federal government. See Elkins v. United States, 364 U.S. 206, 80 S. Ct. 1437, 4 L.Ed.2d 1669 (1960).

To conclude, it is not necessary to go beyond the specific facts of this case in order to afford the defendant relief. Therefore, no attempt is made to determine precisely what the responsibility of the United States Government is for the information lodged in NCIC and what specific steps must be taken to insure an acceptable degree of accuracy. The Court has determined, however, that this type of infringement of the rights of the defendant, perpetrated primarily with the assistance of a mindless automation controlled by the government, cannot be tolerated. All evidence seized as a result of defendant's arrest must be suppressed.

9. The Court is cognizant of the Fourth Amendment basis for the arguments of counsel, but finds it unnecessary to focus on this line of analysis in order to reach a decision. There-fore, there is no need to resolve the issue of the status of NCIC as "reliable informant" so as to justify a warrantless arrest and search.