[Crim. No. 22489. Sept. 6, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
RAUL RAMIREZ, Defendant and Appellant.

542

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Russell I. Lynn and Donald L. A. Kerson, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assis-

tant Attorney General, Norman H. Sokolow, William R. Pounders, Edward T. Fogel, Jr., and Timothy E. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim and Roderick W. Leonard, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant appeals from a judgment convicting him of possession of phencyclidine (PCP). He challenges a ruling denying his motion to suppress evidence obtained during a booking search on the grounds that he. was first unlawfully detained and subsequently arrested on a warrant that had been recalled. We find the latter contention meritorious, and therefore reverse the judgment.

On May 29, 1980, at 12:45 a.m., Officer Gary Brown of the Montebello Police Department was patrolling a business district in Los Angeles when he saw two men, defendant and his friend, standing in front of a closed tire store. The store was recessed some 50 feet from the sidewalk, with a parking lot in between. Brown was aware there had been numerous burglaries and breaking of windows in the area, and knew that the tire store itself had recently been vandalized.

The officer was suspicious that the two men were "up to something." He approached in his patrol car, got out, and asked what they were doing. They replied they were hungry and were looking for a hamburger stand. Brown told them that the nearest place to eat was about six blocks away. One of the men replied they had just been there but had found the establishment closed; however, Brown believed the stand was open.

Thereupon the officer further questioned the two men and asked them to identify themselves. They complied by giving their names and addresses; they were not asked to produce written identification. Brown also conducted a pat-down frisk for weapons. He found none on either man, nor•any rocks or other objects that might be used to break windows or to commit a burglary; nevertheless, he further detained the men while he radioed for a warrant check through the police computer system.

The officer was informed that the computer had revealed an outstanding bench warrant for defendant's arrest for possession of PCP. Although Brown believed the warrant was valid, subsequent inquiry revealed that it

had been recalled some six months earlier, in November 1979. He released defendant's companion, arrested defendant on the warrant, and transported him to jail. During a booking search he discovered a tinfoil bindle containing PCP.

Defendant pleaded not guilty and moved to suppress the evidence seized during the booking search. (Pen. Code, § 1538.5.) The motion was denied. He then negotiated a plea of guilty to a misdemeanor violation of section 11377, subdivision (a), of the Health and Safety Code and was placed on three years' probation, the first ninety days to be spent in the county jail. On appeal he challenges the denial of his motion to suppress. (Pen. Code, § 1538.5, subd. (m).)

■ Defendant first contends that his arrest and subsequent booking search were unlawful because the warrant on which Officer Brown relied had been recalled several months earlier, and because no independent probable cause existed to arrest him. He urges us to reject the People's argument that Brown's good faith reliance on information communicated to him through "official channels" should validate the arrest and search. Because we agree with defendant that his arrest was unlawful, we hold that the fruits of the booking search should have been suppressed.

We begin by examining analogous federal authority. In *Whiteley* v. *Warden* (1971) 401 U.S. 560 [28 L.Ed.2d 306, 91 S.Ct. 1031], a Wyoming magistrate issued an arrest warrant based on a complaint that failed to demonstrate probable cause for arrest, but that instead "consis[ted] of nothing more than the complainant's conclusion that the individuals named therein perpetrated the offense described in the complaint." (*Id.* at p. 565 [28 L.Ed.2d at p. 311].) The warrant information was transmitted over a state-wide radio network, received by a county sheriff's office, and communicated to a local police department. In reliance on the information in the radio communication, a patrolman arrested Whiteley and in an ensuing search seized several items introduced into evidence at trial.

In the subsequent habeas corpus proceeding the state argued that regardless of the sufficiency of the complaint to support the issuance of a warrant, the arrest and search should be upheld because the patrolman acted in reliance on the radio bulletin and reasonably assumed that whoever authorized the bulletin had probable cause to direct Whiteley's arrest. (*Id.* at p. 568 [28 L.Ed.2d at p. 313].) Recognizing that the field officer had acted in good faith, the United States Supreme Court nonetheless invalidated the arrest and search: "We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to

assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." (*Ibid.*) Thus "*Whiteley* teaches that probable cause for arrest is not conclusively established by a police communication asking that the arrest be made, for otherwise such a communication would allow the police to make seizures without the grounds required under the Fourth Amendment." (1 LaFave, Search and Seizure (1978) § 3.5(b), pp. 629-630.)

In *United States* v. *Mackey* (D.Nev. 1975) 387 F.Supp. 1121, a case factually more akin to the situation before us, the defendant was arrested in Nevada on a California warrant that had been satisfied five months earlier. The search incident thereto produced an unregistered firearm. The federal district court held the arrest and search invalid on due process grounds: "The Court finds that a computer inaccuracy of this nature and duration, even if unintended, amounted to a capricious disregard for the rights of the defendant as a citizen of the United States. . . . Once the warrant was satisfied, five months before defendant's arrest, there no longer existed any basis for his detention, and the Government may not now profit by its own lack of responsibility." (*Id.* at p. 1125.) The court stressed that because the erroneous warrant information was recorded in the FBI's National Crime Information Center (NCIC) computer network, "defendant was a 'marked man' for the five months prior to his arrest, and, had this particular identification check not occurred, he would have continued in this status into the indefinite future. . . . Moreover, this could happen anywhere in the United States where law enforcement officers had access to NCIC information. Defendant was subject to being deprived of his liberty at any time and without any legal basis." (*Id.* at p. 1124.)

In the case at bar defendant's arrest is invalid because it was based on the communication of erroneous information to the arresting officer, albeit through "official channels." The fact that the officer acted in good faith reliance on the communication does not magically resuscitate a recalled warrant and, phoenix-like, recreate a valid outstanding document. At the time defendant was arrested there was in fact no warrant in his name and Officer Brown had no independent cause to detain him; thus the arrest was made without probable cause and cannot be sustained. "The point is *not* that probable cause [was] lacking because it turned out that the 'facts' upon which the officer acted were actually not true, for quite clearly information sufficient to establish probable cause is not defeated by an after-the-fact showing that this information was false . . . . Rather, the point is that the police may not rely upon incorrect or incomplete information when they are

at fault in permitting the records to remain uncorrected." (LaFave, *op. cit. supra,* at p. 636, italics in original.)

The People urge that *Michigan* v. *DeFillippo* (1979) 443 U.S. 31 [61 L.Ed.2d 343, 99 S.Ct. 2627], dictates a contrary result. There the defendant was arrested under a Detroit vagrancy ordinance that provided, inter alia, that it was unlawful for any person stopped by the police for investigation to refuse to identify himself and produce evidence of his identity. The Michigan Court of Appeals reversed the trial court's denial of defendant's motion to suppress the evidence found in the search; it held the ordinance unconstitutional. The United States Supreme Court reversed on the ground that an arrest made in good faith reliance on an ordinance subsequently declared to be unconstitutional is made with probable cause and is valid. (*Id.* at p. 37 [61 L.Ed.2d at p. 349].) The court focused on the obligations of the arresting officer and on the role of the police more generally: "At [the] time [of the arrest], of course, there was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance. A prudent officer . . . should not have been required to anticipate that a court would later hold the ordinance unconstitutional. [¶] Police are charged to enforce laws until and unless they are declared unconstitutional. . . . Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." (*Id.* at pp. 37-38 [61 L.Ed.2d at p. 350].)

The case before us is distinguishable. The arrest in *DeFillippo,* for violation of an ordinance subsequently held to be unconstitutional, is fundamentally different from defendant's arrest here, made in reliance on the erroneous police communication that a warrant was outstanding. When a police officer makes an arrest pursuant to an ordinance or statute, he is enforcing the determination by a legislative body that certain conduct is unlawful. Until or unless the legislation is stricken, it is presumptively valid and defines a criminal offense. If probable cause is established for all the elements of the offense, the officer's duty is to apprehend the violator; it is not the function of the officer to anticipate the court's eventual review of the underlying legislation. Nor would one of the goals of the exclusionary rule—the deterrence of law enforcement misconduct (*People* v. *Moore* (1968) 69 Cal.2d 674, 682 [72 Cal.Rptr. 800, 446 P.2d 800])—be advanced by penalizing the police for legislative errors. When the defendant was arrested in *DeFillippo* the Detroit ordinance was still valid; thus there was no *police* misconduct to deter, only *legislative* action to be analyzed.

In the case of an arrest on a recalled warrant, however, the arresting officer is pursuing a course of conduct mandated by fellow law enforcement

officials. ■ It is settled that an officer in the field may rely on information communicated to him by fellow officers to establish probable cause to arrest. (*People* v. *Webb* (1967) 66 Cal.2d 107, 112 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708].) However, if we impute to the arresting officer the collective knowledge of law enforcement agencies for the purpose of establishing probable cause, we must also charge him with knowledge of information exonerating a suspect formerly wanted in connection with a crime. The "fellow officer" or "collective knowledge" rule cannot function solely permissively, to validate conduct otherwise unwarranted; the rule also operates prohibitively, by imposing on law enforcement the responsibility to disseminate only accurate information. (*LaFave, op. cit. supra,* at p. 629.) Had the recall of the warrant for defendant's arrest been entered into the appropriate data processing systems by the responsible law enforcement personnel, Officer Brown would have received an accurate response to his warrant check, i.e., he would have been informed there were no outstanding warrants for defendant's arrest. Because the recall of the warrant was, or should have been, within the "collective knowledge" of the police, we cannot permit the arresting officer to rely with impunity on his fellow officers' errors of omission, but must impute their accurate knowledge to him.

Moreover, also in contrast to *DeFillippo,* this result is consistent with the deterrence goal of the exclusionary rule. In this case, of course, we focus not on the actions of the arresting officer but on the conduct of law enforcement generally. Suppressing the fruits of an arrest made on a recalled warrant will deter further misuse of the computerized criminal information systems and foster more diligent maintenance of accurate and current records.

We observe that a number of states have adopted the *Whiteley* approach of tracing the probable cause determination by the arresting officer to its source in the collective knowledge of the law enforcement system. Several decisions are particularly germane to our analysis of the recalled warrant problem. In *People* v. *Jennings* (1981) 54 N.Y.2d 518 [446 N.Y.S.2d 229, 430 N.E.2d 1282] for example, a police officer stopped the defendant for certain traffic violations and, while writing up the tickets, radioed for a warrant check. Two computer systems reported an outstanding warrant for a parole violation. The defendant was arrested, and a search produced contraband. It was subsequently discovered that the warrant had been executed and vacated several months earlier.

New York's highest court held that the arrest was invalid and that the fruits of the search should have been suppressed. The court relied squarely on *Whiteley* in its analysis: "*Whiteley* v. *Warden* . . . definitively established what has been referred to as the 'fellow officer' rule . . .: in making

an arrest a police officer may rely upon information communicated to him by another police officer as, for example, that an individual is the subject named in a warrant and should be taken into custody in execution of the warrant. However, if, in the example given, the warrant turns out to be invalid, any evidence seized as a result of the arrest will be suppressed notwithstanding the reasonableness of the arresting officer's reliance upon the communication [citation]." (*Id.* at pp. 231-233.) The court explicitly rejected the People's "good faith" argument and concluded that an arrest made on erroneous computer information is made without probable cause. (*Id.* at pp. 232, 230; see also *State* v. *Trenidad* (1979) 23 Wn.App. 418 [595 P.2d 957]; *State* v. *Mooney* (Ind.App. 1979) 398 N.E.2d 698.)

The *Whiteley* "fellow officer" or "collective knowledge" reasoning has also been applied to computer errors concerning auto theft. In *Carter* v. *State* (1973) 18 Md.App. 150 [305 A.2d 856], one Davis reported to the police that the vehicle he had been driving had been stolen. The police issued a bulletin identifying the car by its license plate number. Shortly thereafter the car was involved in a hit-and-run violation and was then recovered by the police. The owner of the car, Davis' brother-in-law, later transferred the license plates from the recovered automobile to another car. Two months after the theft and recovery of the first car, Davis, with defendant as passenger, was stopped for speeding in the second car. When the officer ran a warrant check, identifying the car by its license number, he was informed that the vehicle had been reported stolen and that the operator was wanted in connection with the hit-and-run incident. Although the original stolen vehicle had been recovered, the police bulletin had never been cancelled. Davis and defendant were arrested and in the ensuing search narcotics and a firearm were discovered.

Relying on *Whiteley,* the Maryland court reversed the trial court's finding that the arresting officer had probable cause to arrest: "Probable cause existing at the time of an arrest is the measure of the legality of the arrest. . . . It is settled that probable cause may be based on information within the collective knowledge of the police. . . . [¶] The problem in this case, however, is that the information contained within the collective knowledge of the Baltimore Police Department which was communicated to the arresting officer in the field was completely erroneous, i.e., neither the tags nor the vehicle that he had stopped were stolen property at the time of the arrest. . . . It is one thing to permit an arrest to be made on information residing in the police files; it is another to sanction an arrest the probable cause for which is based on police information which is not true." (*Id.* at pp. 858-859; see also *People* v. *Jones* (1981) 110 Misc.2d 875 [443 N.Y.S.2d 298]; LaFave, *op. cit. supra,* at pp. 635-637.)

Finally, an Illinois appellate court invalidated an arrest made on the basis of outdated warrant information and explicitly contrasted this situation with the problem of the subsequently stricken ordinance: "the subsequent invalidation of an ordinance which was the basis of the arrest will not render unreasonable the initial arrest and accompanying search. [Citation.] . . . On the other hand, although a police officer who is assisting in the execution of an arrest warrant from another jurisdiction may assume that the warrant was issued on the basis of sufficient information to support an independent judicial assessment of probable cause, where the contrary turns out to be true, the illegal arrest cannot be insulated from a challenge to the warrant and the evidence illegally seized in an arrest made without probable cause must be suppressed. (See *Whiteley* v. *Warden* . . . (1971) 401 U.S. 560 . . . .)" (*People* v. *Decuir* (1980) 84 Ill.App.3d 531 [405 N.E.2d 891, 892-893].)

In the few cases in which arrests on erroneous warrant information have been sustained, the delay between the recall or cancellation of the warrant and the transmission of the "stale" information to the field has usually been extremely brief, often only a matter of days. In *Commonwealth* v. *Riley* (1981) 284 Pa.Super. 280 [425 A.2d 813], for example, the Pennsylvania Superior Court held valid an arrest made on a warrant that had been satisfied, but stressed that "the information . . . was stale by only four days." (*Id.* at p. 816.) Similarly, in *Childress* v. *United States* (D.C. 1977) 381 A.2d 614, the court validated an arrest made on a traffic warrant that had been satisfied, but specifically observed that the four-day delay there involved "does not rise to the level of police administrative negligence fatal to the government in *Mackey.*" (*Id.* at p. 618, fn. 3; see also *People* v. *Lent* (1980) 105 Misc.2d 831 [433 N.Y.S.2d 538].)

It is surprising, in this age of computerized data processing, that the issue of the validity of an arrest made on erroneous warrant information has seldom arisen in California. Nevertheless, we must review our law on this subject and confront what has been documented as a real and significant problem. (Doernberg & Zeigler, *Due Process Versus Data Processing: An Analysis of Computerized Criminal History Information Systems* (1980) 55 N.Y.U.L.Rev. 1110; Note, *Garbage In, Gospel Out: Establishing Probable Cause Through Computerized Criminal Information Transmittals* (1976) 28 Hastings L.J. 509; DeWeese, *Reforming Our "Record Prisons": A Proposal for the Federal Regulation of Crime Data Banks* (1974) 6 Rut.-Cam.L.J. 26.)

The principal relevant authority is *People* v. *Marquez* (1965) 237 Cal.App.2d 627 [47 Cal.Rptr. 166]. In that case two police officers stopped an automobile for a traffic violation. As the driver offered identification,

one officer observed new clothing on the floor of the car and noticed that another occupant was resting his feet on it. When the officer then radioed for a warrant check he learned there was a "stop" on the driver, who was wanted for burglary. The defendant was arrested and a search of the car produced more clothing which was subsequently determined to be stolen. It was later ascertained that the warrant information was incorrect: the warrant had been recalled. The court upheld the warrantless arrest, reasoning that "in determining whether or not an arresting officer acts reasonably in believing that the person arrested had committed a felony the court looks only to the facts and circumstances presented to the officer when the arrest was made—not to something later discovered." (*Id.* at p. 633.)

It is possible to distinguish *Marquez* on its facts from the case before us: there the officer had observed the stolen clothes inside the car and his suspicions were presumably aroused before he contacted headquarters, whereas Officer Brown in the instant matter testified that he had no reason to suspect defendant was wanted in connection with a crime when he radioed for the warrant check. Or, we might simply discount *Marquez*, decided nearly two decades ago, as no longer appropriate to an age of police communications by means of computers which because of their size and complexity often contain dated or inaccurate information.

However, because *Marquez* asserts that courts must look only to the perceptions of the officer in the field, rather than trace his probable cause determination to its source in the law enforcement system, it must be disapproved. We are persuaded instead by the reasoning of *Whiteley, Mackey,* and the related decisions of other jurisdictions that an arrest made on a recalled warrant is invalid.

The People cite two related cases. In *People* v. *Honore* (1969) 2 Cal.App.3d 295 [82 Cal.Rptr. 639], an officer who had information that the defendant was selling marijuana from his home ran a warrant check and discovered outstanding warrants for felony assault and for a traffic violation. He arrested the defendant outside his home and, in a subsequent search of defendant's person and home, found weapons and marijuana. Although it was later discovered that a misdemeanor warrant had been substituted for the felony warrant, the court relied on *Marquez* to uphold the arrest and search because the officer had received the warrant information through "official channels." (*Id.* at p. 299.)

*Honore* is distinguishable on the ground that although the warrant details were erroneous there was nonetheless a valid outstanding warrant for the defendant's arrest. In addition, the officer had independent cause to believe a crime had been committed because he had received information that the

defendant was selling marijuana from his home. In our case, before Officer Brown radioed for his warrant check he had no reason to suspect defendant was wanted for criminal activity.

In *People* v. *Knight* (1970) 3 Cal.App.3d 500 [83 Cal.Rptr. 530], the court held that "where, as here, the officer initiating the request for an arrest warrant has probable cause for arrest, and there is thereafter a communication through official channels to arrest on the warrant, the fact the warrant may be invalid for one reason or another [i.e., a defective complaint] should not affect the legality of the arrest." (*Id.* at p. 503.) *Knight* is arguably distinguishable from the present case because apparently there the officer had probable cause to arrest before seeking information. However, to the extent *Knight* relies on *Marquez,* it too is disapproved.

In an analogous context, we have examined the relationship between the conduct of the arresting officer and the underlying source of the probable cause determination. In *Remers* v. *Superior Court* (1970) 2 Cal.3d 659 [87 Cal.Rptr. 202, 470 P.2d 11], we reviewed an arrest predicated on an officer's second-hand knowledge that a young woman he suspected of selling narcotics had previously been arrested in connection with similar activity. The arresting officer did not know the basis of the information furnished to him by fellow officers, and in fact the prior charge against the suspect had been dismissed. We invalidated the arrest, insisting that probable cause be traced to its source: "It is well settled that while it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, 'when it comes to justifying *the total police activity* in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness.' [Citations.] To hold otherwise would permit the manufacture of reasonable grounds for arrest within a police department by one officer transmitting information purportedly known by him to another officer who did not know such information, without establishing under oath how the information had in fact been obtained by the former officer. [Citations.] 'If this were so, every utterance by a police officer would instantly and automatically acquire the dignity of official information; "reasonable cause" or "reasonable grounds," . . . could be conveniently fashioned out of a two-step communication; and all Fourth Amendment safeguards would dissolve as a consequence.' [Citation.]" (*Id.* at pp. 666-667, italics added; accord, *Ojeda* v. *Superior Court* (1970) 12 Cal.App.3d 909, 915-916 [91 Cal.Rptr. 145].) Here Officer Brown's probable cause determination was based on an error in the police communications network, i.e., the failure of the responsible fellow officers to act on their knowledge that in fact probable cause *no longer existed to arrest defendant at all.* If in *Remers* the inability of the People to justify the field officer's probable cause determination by

reference to fellow officers invalidated the arrest, a fortiori here the subsequent discovery that the police had information actually negating any probable cause must invalidate defendant's arrest.

 We hold that an arrest based solely on a recalled warrant is made without probable cause. The fruits of a search incident to such an arrest must, then, be suppressed. Although in this case the arresting officer no doubt acted in good faith reliance on the information communicated to him through "official channels," law enforcement officials are collectively responsible for keeping those channels free of outdated, incomplete, and inaccurate warrant information. That the police now rely on elaborate computerized data processing systems to catalogue and dispatch incriminating information enhances rather than diminishes that responsibility.

We stress that we are not requiring the officer in the field to anticipate a subsequent court ruling on the validity of an ordinance, as in *DeFillippo*. That is not the case before us. Here we decline only to validate an arrest made on the basis of data which a law enforcement agency knew or should have known were in error because of inadequate or negligent record-keeping. The test, under these circumstances, is not merely the good faith of the individual officer in the field, but the good faith of law enforcement agencies of which he is a part.

Defendant also contends that his initial detention was unlawful (*In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957]), and was thereafter unlawfully prolonged while Officer Brown radioed for a warrant check (*People* v. *McGaughran* (1979) 25 Cal.3d 577 [159 Cal.Rptr. 191, 601 P.2d 207]). Since we reverse the judgment for the reasons discussed above we deem it unnecessary to consider defendant's additional contentions.

The judgment is reversed.

Richardson, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

BIRD, C. J.—I concur in Justice Mosk's opinion for the court, except that I would rest the holding on article I, section 13 of the California Constitution. The arrest in this case was made long before the effective date of Proposition 8. Without expressing any opinion as to the effect of that measure on the "independent state grounds" doctrine (see *People* v. *Brisendine* (1975) 13 Cal.3d 528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099]), it is clear that in this case, the court is free to rely on the state constitutional

provision prohibiting unreasonable seizures and searches. (See *People* v. *Smith* (1983) *ante*, pp. 251, 258, 263 [193 Cal.Rptr. 692, 667 P.2d 149].)

Respondent's petition for a rehearing was denied October 6, 1983.