Filed 5/23/17 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>ALEXANDER POU,<br><br>     Defendant and Appellant. | B269349<br><br>(Los Angeles County<br>Super. Ct. No. BA425723)<br><br>ORDER DENYING<br>REHEARING AND<br>MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

Defendant and appellant Alexander Pou's petition for rehearing is denied.  The opinion filed on April 26, 2017, is modified by adding the following to the end of footnote 2, on page 14:

> "For this same reason, defendant's additional contention the Uber driver who called 911 told the dispatch operator that he heard the screaming woman about an hour before calling is irrelevant because none of the responding officers were privy to the 911 call or received such information from the operator.  In any event, knowledge that screams were

heard one hour earlier would not necessarily render
unreasonable the conclusion that an emergency still
existed when the officers arrived at the location and
observed indicia of an ongoing conflict."


_____      _____

KRIEGLER, J.        KIN, J.*

---

*Judge of the Los Angeles County Superior Court, assigned by the
Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 4/26/17 (sent for posting 4/27/17) (unmodified version)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE, | B269349 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA425723) |
| v. | |
| ALEXANDER POU, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of the County of Los Angeles, Michael A. Tynan, Judge. Affirmed.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Michael J. Wise, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Alexander Pou appeals the trial court's denial of his motion to suppress evidence seized as a result of a warrantless entry and search of his home by law enforcement officers. Because we conclude the officers' initial entry and search was justified under the emergency aid exception to the warrant requirement, we affirm the judgment.

## FACTUAL BACKGROUND

On June 2, 2014, City of Los Angeles Police Department Officer Michael Ramsey was on patrol in the Hollywood Hills area with his partner Officer Anaya. Around 12:10 p.m., they received a radio call about a "screaming woman," as well as "distressed moaning," at 2314 Jupiter Drive. They responded to that address with their lights and sirens activated.

Upon arrival at the location, Officers Ramsey and Anaya met with their field supervisor, Sergeant Lloyd Parry, who had arrived before them. The two officers approached the front door of the residence and "could hear several people inside the residence arguing." The arguing was "very loud," but the officers could not understand what was actually being said. The officers, however, could hear that both male and female voices were part of the "loud argument." In addition, Officer Anaya observed from outside that two males inside the residence were making gestures similar to that of people engaged in an argument.

Officer Ramsey knocked on the door and announced his presence as law enforcement "multiple times." Eventually, defendant answered the door with another male. Officer Ramsey informed defendant that the officers had received a radio call about a woman screaming at that address and that they needed

"to come in and look at the apartment to make sure everybody was okay," a precaution that was consistent with their training and experience. Defendant told the officers several times that he did not want them to enter his house.

The officers nonetheless entered the residence to make sure that everyone inside was in fact unharmed. Inside the residence, Officer Ramsey observed two females sitting on a couch in the living room. The officers "made sure [the two women] were okay" and then searched the rest of the house for additional occupants to check on their well being.

Following standard procedure, the officers looked into closets and the other rooms in what Officer Ramsey described as a "very large residence." While continuing on with a "quick search of the house" for additional occupants, the officers saw what they believed to be narcotics in a closed bedroom closet. Prior to swinging the closet door open, the officers could not necessarily tell whether the door was to a closet or some other room. The officers advised Sergeant Parry about the items they had discovered and called a narcotics unit to respond to the location.

Ultimately, narcotics officers responded to the location and obtained a search warrant for the residence. When officers executed that warrant, they located and seized 14.02 grams of cocaine, .077 grams of methylone or MDMA, scales, and money. In addition, the officers retrieved a handgun from a safe under a nightstand in the house.

Because the officers had not located a victim at the 2314 Jupiter Drive location, Sergeant Parry conducted a follow-up investigation by speaking to the person who had made the initial report of the screaming woman. The person who made the report

returned to the scene and explained that he was an Uber driver who had been called to the 2314 Jupiter Drive address to give somebody a ride. The Uber driver, however, explained that his report about a screaming woman pertained to the house across the street from 2314 Jupiter Drive.

Further investigation by Sergeant Parry revealed that an "incident recall" printout did, in fact, state that the incident was "across from 2314 at a house." According to Sergeant Parry, the information in the incident recall printout would have been input into the police computer system by the person who took the telephone report of a screaming woman. Like Officers Ramsey and Anaya, however, Sergeant Parry responded to 2314 Jupiter Drive because the radio broadcast he heard was for that address and not some location "across" from 2314 Juniper Drive.

## PROCEDURAL BACKGROUND

Defendant was charged in a two-count information with possession of cocaine for sale in violation of Health and Safety Code section 11352 (count one) and possession of ecstasy for sale in violation of Health and Safety Code section 11378 (count two). The information alleged as to both counts that in the commission of the charged crimes, defendant was personally armed with a firearm within the meaning of Penal Code section 12022, subdivision (c).

Following the preliminary hearing, the trial court heard argument on defendant's motion to suppress evidence pursuant to Penal Code section 1538.5, denied the motion, and held defendant to answer. Eventually, defendant entered into a plea bargain pursuant to which he pleaded guilty to count 2, and

4

count 1 was dismissed.  The firearm allegations as to both counts were also dismissed.

The trial court ultimately sentenced defendant to eight months imprisonment on count 2, to run consecutively to the sentence in another criminal case (case number KA109209). Defendant timely appealed.

## DISCUSSION

On appeal, defendant contends that the trial erred by denying his motion to suppress evidence seized pursuant to a search warrant obtained because law enforcement officers entered his residence without a warrant or consent and saw illegal narcotics.  We conclude the outcome of this appeal is dictated by our Supreme Court's decision in *People v. Troyer* (2011) 51 Cal.4th 599 (*Troyer*), and hold that the officers' entry into the home and search of the premises for occupants therein was reasonably justified by the emergency aid exception to the warrant requirement.

### A.    Standard of Review

In reviewing the trial court's ruling on a motion to suppress, we defer to the trial court's factual findings if supported by substantial evidence.  (*People v. Hoyos* (2007) 41 Cal.4th 872, 891.)  We review de novo whether the search was reasonable under the Fourth Amendment based on the facts found.  (*Ibid.*; *People v. Ayala* (2000) 23 Cal.4th 225, 255.)

5

## B. The Emergency Aid Exception

In *Brigham City v. Stuart* (2006) 547 U.S. 398, 400 (*Brigham City*), the United States Supreme Court established the so-called emergency aid exception, holding that "police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." In that case, law enforcement officers had entered the defendant's home and made arrests for disorderly conduct and other related offenses when responding to a 3:00 a.m. call regarding a loud party at the residence. (*Id.* at p. 401.) Before entering the home, the officers heard shouting from inside and saw that an altercation was taking place inside between four adults and a juvenile. (*Ibid.*) The altercation included, among other things, the adults attempting to restrain the juvenile; the juvenile breaking free and hitting one of the adults in the face, causing that adult to spit blood into a nearby sink; and the adults thereafter pressing the juvenile against a refrigerator with such force that it moved across the floor. (*Ibid.*) The Supreme Court concluded that the officers were justified in making a warrantless entry under the circumstances because "the need to protect or preserve life or avoid serious injury" was an exigency or emergency that obviated the requirement of a warrant. (*Id.* at p. 403.)

Three years later, the Supreme Court provided additional guidance concerning application of the emergency aid exception in *Michigan v. Fisher* (2009) 558 U.S. 45 (*Fisher*). In *Fisher*, responding to a complaint of a disturbance involving a man "going crazy," a police officer in Michigan entered defendant Fisher's home without a warrant, which led to Fisher pointing a gun at the officer and Fisher's consequent arrest for assault with

6

a dangerous weapon and possession of a firearm during commission of a felony.  (*Id*. at pp. 45-46.)  Prior to entering the home, the police had observed:  the truck on Fisher's driveway was smashed; there were damaged fenceposts along the property and broken house windows; and blood was present on the hood of the truck, on clothes inside the truck, and on one of the doors to the house.  (*Ibid*.)  The police also could see Fisher inside the house with a cut on his hand, screaming and throwing things. (*Id*. at p. 46.)  When the officers knocked on the door, Fisher initially refused to answer.  (*Ibid*.)  When they asked him whether he needed medical attention, Fisher ignored such questions and "demanded, with accompanying profanity, that the officers go get a search warrant."  (*Ibid*.)

The Michigan Court of Appeals had found that the warrantless entry into Fisher's house violated the Fourth Amendment because "the situation 'did not rise to the level of emergency justifying the warrantless intrusion into a residence.'" (*Fisher, supra,* 558 U.S. at p. 48.)  In so holding, that court acknowledged there was evidence from which the police could have reasonably inferred that an injured person was on the premises, but nonetheless concluded that "'the mere drops of blood did not signal a likely serious, life-threatening injury'" necessitating the warrantless entry.  (*Ibid*.)

In reversing the Michigan court, the Supreme Court in *Fisher, supra*, 558 U.S. 45 found the lower court's reasoning "flaw[ed]," explaining that "[e]ven a casual review of *Brigham City*[, *supra*, 547 U.S. 398] reveals . . . [o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid doctrine."  (*Id*. at p. 49.)  The Supreme Court thus clarified that "'[t]he role of a peace officer includes

7

preventing violence and restoring order, not simply rendering first aid to casualties' [citation]. It sufficed to invoke the emergency aid exception that it was reasonable to believe that Fisher hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." (*Ibid.*) Underlying the Supreme Court's holding was its reasoning that the emergency aid exception "requires only 'an objectively reasonable basis for believing' [citation] that 'a person within [the house] is in need of immediate aid' [citation]." (*Id.* at p. 47.)

Two years later, our Supreme Court had occasion to expound on the emergency aid exception in *Troyer, supra,* 51 Cal.4th 599. In *Troyer*, our Supreme Court emphasized that invocation of the emergency aid exception to justify a warrantless search only requires an objectively reasonable basis by law enforcement to believe that someone on the premises is in need of immediate aid. (*Id.* at p. 605.) As the court explained, this approach is based on "some measure of pragmatism" in that, "[i]f there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way. [Citation.]" (*Id.* at p. 606.) Thus, our Supreme Court rejected the suggestion that application of the emergency aid exception must be established by proof amounting to probable cause, which would require officers at the time to form "'a reasonable ground for belief of guilt' that is 'particularized with respect to the person to be searched or seized.' [Citation.]" (*Ibid.*) The court explained that such a requirement would not make sense in an emergency situation "where the police must make split-second decisions as to whether someone is in need of immediate aid." (*Ibid.*) Indeed, the court observed that "[p]eople

8

could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. [Citation.]" (*Ibid.*)

The court in *Troyer, supra*, 51 Cal.4th 599 further noted that, in applying the objective reasonableness standard, the police may even permissibly make mistakes if objectively reasonable, explaining that "when we balance the nature of the intrusion on an individual's privacy against the promotion of legitimate governmental interests in order to determine the reasonableness of a search in the circumstances of an emergency [citation], we must be mindful of what is at stake." (*Id.* at p. 606.) Accordingly, our Supreme Court concluded that "[t]he possibility that immediate police action will prevent injury or death outweighs the affront to privacy when police enter the home under the reasonable but mistaken belief that an emergency exists." (*Ibid.*)

The court in *Troyer, supra,* 51 Cal.4th 599 thus found the emergency aid doctrine justified the warrantless search of defendant's home by police responding to a dispatch report of shots fired at the location. When police arrived, they found on the front porch a male administering aid to a female victim who had been shot multiple times, as well as another male on the porch with a head wound and blood streaming onto his face. (*Id.* at p. 603.) When the wounded female could not provide information to the officer because she was "in obvious distress," the officer questioned the "excited and agitated" wounded male, who said that two individuals were involved who fled in a vehicle. (*Ibid.*) When the officer asked the wounded male if anyone else was inside the residence, which had blood on the front door, the male first stared at the officer for 15 to 20 seconds without

9

responding, then said he "did not think so," and finally said "no" after taking a long pause. (*Ibid.*) The police then entered the house to look for victims and suspects. (*Id.* at p. 604.) Based on the foregoing, the court held that "[u]nder the circumstances, and inasmuch as [the police] did not know who had been the aggressor, an objectively reasonable basis existed to enter the residence to search for additional victims." (*Id.* at pp. 608-609.)

After the police entered the home and found nothing downstairs, they expanded their search upstairs, "continuing to look in places where a body could be." (*Troyer, supra,* 51 Cal.4th at p. 604.) That upstairs search led to entry into a locked bedroom, where the police saw balls of marijuana and an electronic scale, which, in turn, led to a search warrant for the home; the seizure of marijuana, firearms, and $9,000 cash; and the arrest of the defendant on charges arising from his possession of those items in his residence. (*Ibid.*) The court rejected the defendant's contention that the scope of the officers' search was unreasonable, explaining: "[T]he scope of a warrantless search 'must be strictly circumscribed by the exigencies which justify its initiation.' [Citation.] Here, the same facts that justified entry into the residence justified a search of places where a victim could be, which included the upstairs bedroom." (*Id.* at p. 612.)

Notably, the Supreme Court's conclusion in *Troyer, supra,* 51 Cal.4th 599, that the warrantless entry and full search of the defendant's residence was objectively reasonable, was not undermined by the fact that no additional victims or suspects relating to the shots fired emergency were ultimately found in the house. The court specifically noted that "[a] 'hindsight determination that there was in fact no emergency' does not

10

rebut the objectively reasonable basis for believing that someone in the house was injured or in danger.  [Citation.]" (*Id.* at p. 613.)

### C.    The Search of Defendant's Residence

The search of defendant's house falls squarely within the emergency aid exception as shaped by *Brigham City*, *supra,* 547 U.S. 398, *Fisher*, *supra*, 558 U.S. 45, and *Troyer, supra,* 51 Cal.4th 599.  Here, the officers were told by the radio dispatch operator that someone had reported hearing a screaming woman and distressed moaning at the location.  Upon arrival, consistent with the radio dispatch call information, the officers could hear from the outside loud voices—both male and female—engaged in an argument inside the house.  One officer additionally saw through the window that two males in the house were gesturing as if arguing.  Under these circumstances, it was objectively reasonable for an officer to believe that immediate entry was necessary to render emergency assistance to a screaming female victim inside or to prevent a perpetrator from inflicting additional immediate harm to that victim or others inside the house.

The objective reasonableness of the decision to enter and search was bolstered by the fact that there was a delay before any occupant answered the door in response to the police knocking and identifying themselves multiple times.  Under the circumstances, the delayed reaction by the occupants of a house from which loud arguing could be heard would have roused an officer's suspicions.  In *Troyer, supra*, 51 Cal.4th at page 608, the court cited with approval a federal appellate decision (*Causey v. City of Bay City* (6th Cir. 2006) 442 F.3d 524, 530) holding that police reasonably conducted an emergency aid search after

11

receiving assurances that no one was injured, because the officers could have inferred the person offering such assurances was concealing an injured person or was being intimidated by an unseen attacker. Here, too, it was reasonable for the officers to enter defendant's house without a warrant, even after defendant told them several times he did not want them to enter.

Further, we find the scope of the search here was reasonably tied to the apparent emergency with which the officers were presented. The location was a "very large house," and, under the emergency aid exception, the officers were entitled to conduct an emergency search of all places in the house where a body (victim or suspect) might have been hiding or lying in wait, including the closet in which the drugs were found. The fact that the officers at the commencement of the search encountered an additional male and observed two females sitting in the living room whom they verified "were okay" did not mean the emergency search could go no further. As the court observed in *Troyer*, *supra*, 51 Cal.4th at page 609, "ordinary, routine common sense and a reasonable concern for human life justified [the police] in conducting a walk-through search truly limited in scope to determine the presence of other victims [citation]" where the police had no information whether there was only *one* victim.

Here, it was objectively reasonable for the police to continue with their emergency search because they had yet to find the screaming woman whom they reasonably could have concluded under the circumstances had been hidden away, harmed further, or silenced in some other part of the large house after the police had alerted the occupants to their presence. Moreover, at that point in the search, the officers had neither located nor prevented from causing further harm any perpetrator

12

who might have been arguing with and causing harm to the screaming woman.  It was, therefore, reasonable for the officers to continue with their emergency search to find the victim or suspect in order to prevent further immediate harm.[1]

Finally, the fact that the officers mistakenly searched the wrong location does not undermine the reasonableness of their decision to conduct the search based on the information they had at the time.  Both of the officers and the sergeant were informed by the radio dispatch broadcast that the location of the screaming woman was 2314 Jupiter Drive.  They had no reason to question the accuracy of the reported address when they responded to that location.  Indeed, from an objective standpoint, the seeming accuracy of the address was confirmed (albeit incorrectly) upon arrival when the officers heard loud arguing coming from that precise location and saw two men engaged in an argument therein.  Based on these facts, it was objectively reasonable for the officers to conduct an emergency search of 2314 Jupiter Drive, even though it later turned out that the original distress

---

[1]	For these reasons, defendant's reliance on *People v. Ormonde* (2006) 143 Cal.App.4th 282 is misplaced.  In that case, the officers had no objectively reasonable basis to search the defendant's apartment because they had already arrested the defendant for battery outside the apartment and "[n]one of the police officers who testified articulated any reason to believe that other victims or suspects were involved in the battery, or inside the apartment." (*Id*. at pp. 291-292).  Here, by contrast, at the initiation of the search, the officers had yet to confirm the whereabouts or identity of any victims or suspects—all of whom were likely to be found, if anywhere, in the house from where the screaming and arguing came.

call concerned a location across the street.[2]  We do not with a "hindsight determination" upend the officers' objectively reasonable conclusion that an exigency existed at the location simply because we subsequently learn of contrary facts unknown to the officers at the time they made their decision.[3]  (See *Troyer, supra*, 51 Cal.4th at p. 613; see also *Hill v. California* (1971) 401 U.S. 797, 804 [search incident to arrest valid where arresting officers had a "reasonable, good faith belief" that the man they mistakenly arrested was another man for whom they had

---

[2]     Defendant concedes in his opening brief that the officers' decision to search was objectively reasonable, stating:  "Based on the facts which the officers believed to be true, it was not unreasonable for them to make the initial entry."  Defendant's contention is that the legality of the search should be evaluated in light of information the dispatch operator possessed as to the true location for the call, but *Troyer, supra*, 51 Cal.4th at page 613, makes clear we must look to what the officers making the decision to search knew at the time.

[3]     *People v. Ramirez* (1983) 34 Cal.3d 541 (*Ramirez*), which defendant calls "instructive" on this point, is inapposite.  In *Ramirez*, the court suppressed evidence from a booking search after it was determined that the warrant in the computer system providing the basis for the defendant's arrest had been recalled months earlier.  Not only does *Troyer, supra*, 51 Cal.4th at page 613, instruct that we must look to what the officers knew at the time of the search, but it would appear subsequent United States Supreme Court precedent has entirely undermined *Ramirez*'s efficacy.  (See *Herring v. United States* (2009) 555 U.S. 135, 146-148 [holding that exclusionary rule suppression should not apply where law enforcement personnel were negligent in failing to expunge from their computer system a warrant that led to the defendant's arrest and a search incident thereto].)

14

probable cause and sought to arrest]; *People v. Espino* (2016) 247 Cal.App.4th 746, 760 [upholding arrest as lawful where officers made "good faith mistake of fact" that a diamond in the defendant's pocket was crack cocaine].)


## DISPOSITION

The judgment of conviction is affirmed.
CERTIFIED FOR PUBLICATION


KIN, J.*


We concur:



TURNER, P. J.



KRIEGLER, J.


---

*     Judge of the Superior Court of the County of Los Angeles, appointed by the Chief Justice under article VI, section 6 of the California Constitution.